NOTICE

Decision filed 02/04/25. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2025 IL App (5th) 230501

NO. 5-23-0501

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

_____

| KEVIN D. MOGENSEN, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Madison County. |
| | ) | |
| v. | ) | No. 18-L-985 |
| | ) | |
| SCF LEWIS AND CLARK FLEETING LLC, | ) | Honorable |
| | ) | Sarah D. Smith, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE WELCH delivered the judgment of the court, with opinion.
Presiding Justice McHaney and Justice Cates concurred in the judgment and opinion.

**OPINION**

¶ 1 The plaintiff, Kevin D. Mogensen, sued the defendant, SCF Lewis and Clark Fleeting LLC (Fleeting), under the Jones Act (46 U.S.C. § 30104 (2018)), for negligence resulting in injuries he received on March 17 and 18, 2018. The defendant appeals from an order of the trial court directing a verdict in favor of the plaintiff as a sanction for the defendant's attorney revealing the substance of trial testimony to a witness. Following the directed verdict, the jury awarded the plaintiff $3.31 million in damages. On appeal, the defendant argues that the trial court committed reversible error by imposing the sanction of striking the pleadings, the court committed multiple evidentiary errors that cumulatively deprived the defendant of a fair trial, and the jury's award of noneconomic damages was excessive and unsupported by the evidence. For the following reasons, we affirm.

1

¶ 2                                    I. BACKGROUND

¶ 3       On July 31, 2018, the plaintiff filed a complaint against the defendant under the Jones Act. The plaintiff was employed by the defendant on March 17 and 18, 2018, as a boat mate and member of the barge crew owned and operated by the defendant. The plaintiff was severely injured when loading corn product from a conveyor into a barge while working on the Mississippi River in Madison County. The plaintiff argued that the defendant was negligent where it failed to provide him with a reasonably safe place to work, reasonably suitable equipment to perform his assigned duties, adequate supervision in performing his duties, adequate assistance to perform his assigned duties, and an adequate ventilation mask to filter out airborne particles.

¶ 4       The plaintiff argued that, as a result of the defendant's negligence, he was harmed in the following ways: (1) he was made sick and suffered extensive injuries to his lungs and body; (2) he lost money from lost wages in the past and was reasonably certain to lose wages in the future; (3) he suffered a loss of earning capacity; (4) he had pain and suffering in the past and was reasonably certain to experience pain and suffering in the future; (5) he was obligated to expend large sums of money for necessary medical care, treatment, and services in the past and would be required to expend money for the same in the future; (6) he had disability in the past and will continue to have disability in the future; and (7) he sustained permanent disfigurement. The plaintiff's complaint also alleged unseaworthiness in count II and maintenance and cure in count III.

¶ 5       On September 5, 2018, the defendant filed an answer, which included affirmative defenses alleging that the plaintiff's own negligence caused his injuries, in whole or in part, where he failed to exercise care for his own safety and failed to perform his job duties in a safe, proper, and prudent matter. The defendant argued that the plaintiff's recovery was barred or reduced under the

2

principles of comparative fault. Further, the defendant alleged that the plaintiff failed to mitigate his damages and failed to state a claim upon which relief could be granted, that the plaintiff's alleged injuries were preexisting, that the plaintiff's exclusive remedy was under the Longshore and Harbor Workers' Compensation Act (33 U.S.C. § 901 *et seq.* (2018)) and/or the Illinois Workers' Compensation Act (820 ILCS 305/1 *et seq.* (West 2018)), and lastly that, should the defendant be held liable to the plaintiff, it was entitled to limit its liability under 46 U.S.C. §§ 30501-30512.

¶ 6    On January 3, 2023, a pretrial hearing was held. The trial court addressed the parties' multiple motions *in limine*, one of which barred any mention or reference to the plaintiff's workers' compensation claim arising from his injury on February 1, 2018.

¶ 7    The following interaction between the trial court and defense counsel then occurred:

"DEFENSE COUNSEL: So that ends the motions *in limine*. We had just a few brief questions that it could be yes/no.

THE COURT: Absolutely. Go ahead.

DEFENSE COUNSEL: We would like to invoke Rule [of Evidence] 615. I didn't know if we needed to do that today or at trial.

THE COURT: You can do it whenever.

DEFENSE COUNSEL: Okay. We invoke Rule 615."

¶ 8    During *voir dire*, the plaintiff's counsel made the following statement to the panel:

"Does everyone understand that this is Kevin's only way in our justice system in which he can be made whole and compensated for what he's been through and what he's going to go through in the future, this is his only shot here? Due to the federal law that covers him, he was a barge worker under the Jones Act, so it's a federal statute. He's not covered under

3

Illinois workmen's comp[ensation]. So I know some of you people, ladies and gentlemen, had talked about how you had previous work comp injuries and you were able to be compensated, but Kevin wasn't covered under any state's work comp, so this trial is his only ability to seek compensation for what he's been through and what he's going to go through in the future based on his condition."

No objection was made by the defense as to the plaintiff's counsel's comments.

¶ 9    On January 9, 2023, the trial commenced. David Totsch, the defendant's safety manager, testified that he was aware that vessels or boats were required to be seaworthy. He was also in charge of training Fleeting employees and was essentially in charge of everything related to the health and safety of Fleeting employees. He admitted that employees were not given a mask or respirator as part of their safety equipment. Fleeting employees worked on vessels or boats and picked up barges that had been loaded with a product or material. The product or material reached the barges through conveyor belts. The product or material rode on the conveyor belts out to the barges and then fell off the conveyor belt into the barges. After the product or material was loaded into the barge, the Bulk Services (Bulk) workers then cleaned the product or material off the surface of the barge by using brooms and blowing it off with leaf blowers.

¶ 10    Robert Stepanek, a captain for Fleeting at the time of the incident, testified that, as captain, he was the only person that could document things in the vessel logs, which included recording any injuries or accidents. During the five times that he worked with the plaintiff, he never saw him having any breathing problems. He was also a Coast Guard designated examiner for Aaron Adams, a captain for Fleeting. On the night of the incident, the vessel log did not record any workplace injury for the plaintiff.

¶ 11    Adams testified that he was trained by Fleeting in safety and health. He was also trained on how to fill out vessel logs and accident reports. He was the captain of the Velda Taylor vessel during the months of February and March 2018, including March 17 starting at 6 p.m. through March 18 at 6 a.m.; the Velda Taylor was the vessel that the plaintiff was on during the shift at issue. The crew started at the shop barge. They then went to "6 Wire" and then from there took an empty barge to "Red Dock." Then, they checked the fleets, which concluded at 8:20 p.m. The crew went back to 6 Wire, started a pump, and then did standby from 8:20 p.m. until 12:30 a.m. Adams testified that he did standby at Bulk's fleet so he could watch the entire area. At 12:20 a.m., the crew went to "White Dock," which was owned and operated by Bulk. The crew picked up a barge at White Dock and took it to "Load Fleet" near the shop barge and tied the barge off with the other barges at Load Fleet. At 12:40 a.m., they went to 6 Wire, picked up a barge, and then went back to White Dock and dropped it off. At 12:55 a.m., they got a barge and went from Red Dock to 6 Wire. Then from 1:10 to 1:20 a.m. they went to "Piling Fleet" and got a barge and took it to Red Dock. From 1:20 a.m. to 5:25 a.m., the crew watched fleets at Bulk's fleet, stood by, and had the pump running at 6 Wire. At 5:25 a.m. they picked a barge up from Red Dock and took it to Load Fleet. At 5:40 a.m., they picked a barge up from Bi-State and took it to Red Dock. They then left Red Dock and went back to the shop barge for a crew change. Nothing in the vessel log indicated that the plaintiff suffered an injury during the shift. The plaintiff was on board the vessel from 7:30 p.m. until the end of the shift.

¶ 12    Billy Balcom, a mate for Fleeting at the time of the plaintiff's injury, testified that he showed the plaintiff around the vessel on the night of March 17, as it was the plaintiff's first time aboard the Velda Taylor. Later that night, the plaintiff came to him after they had moved a fertilizer barge. Although this barge was supposed to have already been cleaned, this had not been done

yet. As a result, workers loaded the barge and cleaned it off with leaf blowers, blowing the fertilizer off the barge. Not too long after that, Balcom was in the wheelhouse talking to the captain. He came back down, and the plaintiff explained that he was having breathing problems. He asked if the plaintiff had asthma or if it was anything similar, and he went through the steps trying to make sure everything was okay. The plaintiff responded "no, it's not normal." The plaintiff said he did not have any of these issues on a normal basis. Then, they went to file the incident report. However, they ended up having Dave Totsch and some other people come down.

¶ 13   In describing the scene, Balcom testified that, while the barge was being cleaned, "[w]hen they blow that stuff, it goes everywhere." He testified that the plaintiff was next to him on the barge while it was being cleaned. The plaintiff was less than 50 feet away from the blowing. This occurred for at least 30 minutes. He did not know the name of the product but described it as pure yellow. "I mean, it's as yellow as you can get, and it stinks like pig manure, straight pig manure. You'd think it came right out of a pig farm." Following the exposure, they both had it all over them. "It was everywhere. I—I'm not trying to be joking over here, but we looked like a couple Minions out there afterward." After the exposure, the plaintiff was having breathing problems. Balcom reported the plaintiff's condition to Adams. The plaintiff was in enough stress that Balcom did not allow him to leave the boat until another member of personnel came to see him. Eventually, they went back to the shop barge. Totsch boarded the boat at the shop barge. At the time, he was the head of safety. Balcom then left after giving his information, and the plaintiff and Totsch were in the galley.

¶ 14   Balcom testified that he could tell the plaintiff was uncomfortable being unable to breathe. He observed the plaintiff under distress, and this lasted through the end of the plaintiff's shift. On cross-examination, he testified that the full barge they picked up was full of cargo that was bright

6

yellow like Big Bird. Looking to exhibit 25, the vessel log, Balcom identified the load at issue as "big 654 white to load." He also identified Bulk as the company that loaded and cleaned the barges. He acknowledged that he made the decision that the barge was too dirty and that resulted in Bulk coming in and doing a "recleaning," as the barge was too dirty, and there was over a five gallon bucket full of product. The barges were approximately 195 to 200 feet long; he was standing at the end of the barge called the bow, and the plaintiff was at the stern. It was his testimony that, when the Velda Taylor arrived at the dock, Bulk spent about five to seven minutes cleaning it with leaf blowers. Ultimately, the barge was successfully moved away from the dock. Balcom was 100% sure that the cargo was yellow.

¶ 15    Dr. Thomas Hyers testified as an expert in pulmonary medicine. He took the plaintiff's history and reviewed his medical records. The plaintiff was seen at the Veterans Affairs hospital (VA), and he was treated for respiratory symptoms after an exposure on February 1, 2018. The plaintiff was cleared to return to full duty sometime in the middle of February. Prior to March 17, the plaintiff was again seen at the VA and received some pulmonary medication. Subsequent to his exposure on March 17 and 18, his respiratory symptoms worsened, which eventually brought him to the hospital at Alton Memorial. Once there, he was diagnosed with status asthmaticus, which was severe asthma, and acute hypoxic respiratory failure. It was a life-threatening situation, so he was admitted to the hospital. The plaintiff was endotracheally intubated. He was eventually extubated and released from the hospital. It was Dr. Hyers's opinion that the exposure on March 17 and 18 was the incident that precipitated the need for hospitalization and respiratory support because of the severe asthmatic attack. It was also his opinion that the duration of that obstruction that was demonstrated objectively in 2019 and again in 2022 indicated permanence. He opined

7

that the permanence of the spirometry and the plaintiff's persistent shortness of breath with exertion indicated that the plaintiff had a respiratory disability.

¶ 16    Dr. Salvador Lobianco, a doctor in the intensive care unit (ICU) at Alton Memorial, testified that he treated the plaintiff. According to another doctor's note, the plaintiff had been short of breath all day, and his oxygen saturation was low. He was also using his inhaler without relief. At the time he saw the plaintiff, the plaintiff was already intubated and sedated. The plaintiff presented as purple due to decreased oxygen saturation. It was his opinion that the plaintiff was suffering from a life-threatening pulmonary condition when he arrived at Alton Memorial Hospital. He was extubated the following day.

¶ 17    Brad Morris, the plaintiff's stepfather, testified that the defendant was very active prior to the incident at Fleeting. The plaintiff enjoyed hiking, running, and exercising and led an active outdoor lifestyle. The defendant also served in the Marine Corps. Following the incident, the plaintiff moved to Alabama to live with the family so they could help him with breathing treatments. Since the incident, he had observed the plaintiff unable to live his active lifestyle.

¶ 18    The plaintiff testified that, as a child, he enjoyed doing many active outdoor activities as well as music. During junior high and high school, his breathing did not affect him in any way. After high school, he joined the Marines. He was honorably discharged from the Marines, and then he went into underwater welding. He received his diving certification and dove up to 280 feet for his job in the Gulf of Mexico. After approximately 1½ years, he moved to Alton and started attending Lewis & Clark Community College. While there, he began working for SCF Lewis and Clark Terminals LLC (Terminals).

¶ 19    Prior to starting work at Terminals, on January 25, 2018, the plaintiff signed an acknowledgment of hazard communication training. The plaintiff then explained the process by

which the products were loaded. It was his understanding that most of the products or materials were various types of grain and fertilizer. He worked at Terminals for a short time, approximately one month. On February 1, 2018, he was supervising a grain dump. Then, "something happened with the hoppers and them turning on, turning off, and basically the whole room—a room double the size of this—turned into nothing but thick—a thick cloud of grain like that." After this event, he did receive some medical treatment; however, he was not intubated, nor was he diagnosed with acute hypoxic respiratory failure. He was also declared fit for work. During the next few days, he was labored in his breathing and dealt with things he had never dealt with before, such as coughing up various colors of mucus. In February 2018, he spoke with someone at Terminals about getting transferred out to the boat company Fleeting. He was subsequently transferred from Terminals to Fleeting at the end of February. He acknowledged that Terminals employees worked around the same types of products and materials that Fleeting employees work around. While he worked at Fleeting, he worked on and around barges.

¶ 20    The plaintiff started out as a deckhand at Fleeting. The personal protective equipment provided to him included a personal flotation device, safety goggles, gloves, and a beacon for the flotation device. There was no breathing protection provided. Turning to his shift that started on March 17 at 6 p.m. and lasted until March 18 at 6 a.m., the plaintiff first reported to the Katherine B. Wayne vessel. He was not having any breathing problems when he reported to work that day. For the first 30 minutes of work, he shadowed the lead deckhand and inspected the integrity of the vessel. Eventually, he was called to another boat. When they got back to land, he proceeded from Sauget to Granite City. He arrived in Granite City sometime after 7 p.m. on the Velda Taylor. This was his first time on that stint of the river, and they were moving and placing barges within a little stretch of the river to be loaded or unloaded with various types of products.

9

¶ 21    At some point on the Velda Taylor, the plaintiff suffered an exposure while working. The exposure occurred between midnight and 1 a.m. The crew was in the process of cleaning the barge, and they were blowing material off with blowers and push brooms. The terminal crew was sweeping dust from the gunwales, which was the side part of the barge, and then in the hopper portion, there was a worker on top of those blowing with a backpack blower. The plaintiff described this as a "leaf blower kind of thing." All he could see was the silhouette of the barge, a dust cloud, and the flood lights beyond it. Balcom gave him orders to stand on the stern of the barge, and then when Balcom radioed him or gave the signal, they would take the barge and move it somewhere else. This meant that, while the cleaning process using the leaf blowers was still occurring, they touched up to the barge itself and boarded the barge. The dust was blown in his direction. He stood there for 5 to 10 minutes and was covered in dust. The dust had a yellow tinge and left an oily residue when wiped off.

¶ 22    After the plaintiff got back to the boat, the first thing he did was report to Balcom his condition. Balcom then reported what the plaintiff said to Captain Adams. After they returned to the main dock, Totsch boarded the vessel. Totsch and Adams approached the plaintiff in the galley, where he gave a brief overview of what had happened and whether he was fit to proceed with the rest of the evening. The plaintiff decided to proceed with the duration of the shift. Throughout the rest of the shift, he had internal panic but was trying to keep his wits about him so that he did not fall off the barge. He used an albuterol rescue inhaler that he had on him. He was trying to control his breathing, and when he got to the galley, he did a self-check. He described it as a slow, internal suffocation, and he was trying to rectify that with what he had on him.

¶ 23    When the plaintiff's shift concluded, he returned home for the remainder of the day. He cleaned himself off and monitored his condition over the next 20 hours. Throughout the day, he

got progressively worse. While at home, he e-mailed Larry Davis and reported that he was having trouble breathing. He was eventually able to fall asleep but woke up unable to take a breath. Not only could he not breathe, but it felt like his heart was being ripped in half, and he thought he was going to die. His girlfriend then called 911. He then passed out and woke up a few days later. He did not recall being intubated or on the ventilator for 36 hours.

¶ 24    Eventually the plaintiff was able to return home, but he required assistance. He had to use his nebulizer more than he expected, and he was limited in what his body could do and relied on others for help. For example, he could no longer carry groceries into the house and relied on his girlfriend to do that for him. He was on both timed and as-needed medications for his breathing. He spent between two to three hours per day on medications and breathing treatments. Then, at the end of summer, early fall, the plaintiff decided to move to Alabama with his family so they could help share in the burden of his care.

¶ 25    While in Alabama, he enrolled in a local community college and began competitive fishing through a campus group. He was able to begin working in approximately July 2020. He missed work from March 19, 2018, through summer 2020, approximately two years and three months. In the five years since the incident, the effects were life-altering. He could no longer hike, longboard, go to the gym, help people, run, go fast, or ride bikes. He also had to have his neighbor mow his lawn. He lost his girlfriend, as it was hard for him to have sex without coughing on her. He also coughed in public and woke up in a panic from the phlegm or sputum that accumulated when he slept. There were certain tasks that caused coughing fits but were necessary, like going to the grocery store, and if he pushed too hard, he was forced to rely on his nebulizer.

11

¶ 26　The plaintiff then identified plaintiff's exhibit 90 as a roster that denoted the days he worked for the defendant and the boats he worked on. The exhibit was entered into evidence over the defendant's objection for lack of foundation.

¶ 27　On cross-examination, the plaintiff admitted that, following the February 1 incident, his lungs felt heavy, he was coughing up what looked like pancake batter, and he went to the emergency room on February 16, February 19, and March 8. He complained of shortness of breath and chest pain with his coughing. The plaintiff also testified that he fished in college. In 2020 he began working as a carman mechanic for Inter-Rail. He worked there until 2021 when he began working at Bertram Yachts. He then moved to Holland Fiberglass Fabricators. He testified that he was continuing to try and get his life back.

¶ 28　Joy Morris, the plaintiff's mother, testified that the plaintiff was the oldest of four children. She described him as a fun, witty, adventurous, and active child. Around 8 or 9 years old, the plaintiff was diagnosed with seasonal asthma until he was 10. From the age of 10 until he graduated high school, the plaintiff had no other pulmonary issues. After graduating high school, he joined the Marine Corps. After the plaintiff moved out, the family moved to Alabama. While the plaintiff was in the Marines, he never complained of pulmonary issues. After he left the Marines, he went to underwater welding school and became a certified diver. In about 2015, the plaintiff moved to Alton to live with a friend during the offshore offseason. There, he attended community college and worked through 2018.

¶ 29　In February 2018, the plaintiff told Morris that he had an incident at work. He told her that he was dusted, or dumped on, with corn grain. After the incident, he was transferred to boats. On March 17 and 18, the plaintiff was again dusted with corn dust and ended up in the hospital. The plaintiff was already in a coma when she arrived at the hospital from Alabama; he was in a coma

12

for a couple of days. Once the plaintiff was extubated, she stayed for a few more days to help care for him, and then she turned his care over to his girlfriend and returned home to Alabama. In 2018, a few months after the accident, the plaintiff moved to Alabama to live with them. Prior to the accident, the plaintiff had no plans to move to Alabama. While living in Alabama, she saw the plaintiff on a daily basis and observed his pulmonary issues. She could hear him "hack" up all night; he would go to do things and go into coughing fits she called "coughing up a lung" and noted that even walking up the stairs made him winded. The plaintiff lived with them for approximately two years. He attended community college, fished, and worked for the railroad. She observed him using his rescue inhaler and having coughing fits that led to him coughing up what looked like pancake batter several times per week. She described the plaintiff during this two-year period as not as lively and inhibited in the things he wanted to do.

¶ 30    Brad Bocian testified via video evidence deposition that he first met the plaintiff when they were in sixth grade. He never observed the plaintiff having any breathing issues from the time they met through adulthood. He had also never seen the plaintiff smoke a cigarette or marijuana. After the Marines, he recalled the plaintiff going to work for Triton Diving as an underwater welder. The plaintiff lived with him from May 2015 through August 2018. During this time, the plaintiff enjoyed outdoor activities, including five-mile walks with his dogs, and liked staying active. The plaintiff enjoyed going to the gym and doing cardio. He was living with the plaintiff at the time of the event in February 2018 that led to the plaintiff being hospitalized. Between the February incident and the March incident, the plaintiff was able to care for himself and his dog and work full duty with no restrictions. Other than occasional irritations, the two did all the normal activities they usually did. When the plaintiff got transferred to work on the boats, he complained that the situation was even worse because now he could not escape the corn dust that blew everywhere.

13

After the March 17 incident, he received a text message from Morris that the plaintiff was in the hospital. When he went to the hospital to visit the plaintiff, he found him in a medically induced coma and intubated. The plaintiff was eventually extubated and moved to a regular floor in the hospital.

¶ 31    Bocian was present when the plaintiff was discharged and heard the explanation by the doctors on how to use the breathing equipment in case there was another episode or if the plaintiff needed help doing the treatments. At first, the plaintiff was doing breathing treatments several times a day, then he tapered off to daily, and then, a few weeks later, it became as needed. The treatments lasted between 15 and 20 minutes.

¶ 32    In 2018, Bocian recalled they had between 10 and 15 chickens. However, as they were planning on moving in the spring, they began to either give the chickens away or dispatch them. After the plaintiff's incident, he could no longer help take care of the chickens, so they got rid of the remaining chickens. In July 2018, he moved to Texas, and the plaintiff was on his own. The plaintiff then moved to Alabama, so he could be near his family and have someone around to help him. On the occasions he saw the plaintiff thereafter, the plaintiff was unable to do any aerobic or exertion type activities. He was unable to fully participate in activities, and those that he did participate in had to be cut short, such as the light hikes they attempted in Colorado and Alabama. He stated that the plaintiff was unable to do any strenuous activity. He also noticed a negative shift in the plaintiff's lifestyle and believed that the plaintiff was depressed.

¶ 33    On redirect examination, Bocian was asked the following question.

      "Q. Following that, did you ever feel comfortable probing [the plaintiff] about what caused his hospitalization?

14

A. *** He basically just kind of laid out—it was honestly—it—the, the situation he described then was very similar to what he described happened a couple weeks ago. He said it was like the same, he felt the same—"

At this point the video was paused, and a sidebar was held. Once in chambers, the defense raised three objections based on the plaintiff violating the court's motions *in limine*. First, the defense argued that the plaintiff introduced evidence regarding his depression. Second, he presented evidence regarding his recent hospitalization. Third, he introduced evidence regarding the plaintiff's respirators that he owned and used. The court released the jury and then addressed the defense's objections. As to the recent hospitalization, the court noted that Bocian did not go into detail in his answer to the final question. The court's concern was that the witness would go into the hospitalization, 911, calling the paramedics, etc. The court found that the defense cured any potential error by having the video stopped before the witness went into any specific detail. The defense disagreed and moved for a mistrial. The court noted that, if the remainder of the video had been played, there would be a stronger argument for mistrial, but as the video was paused, the court denied the defense's motion for mistrial.

¶ 34　Regarding the respirator issue, the trial court found that the plaintiff opened the door on that issue and allowed the defense to recall him as a witness on that limited issue. As to the issue of the plaintiff opening the door as to his depression diagnosis, the court took the matter under advisement.

¶ 35　After the plaintiff presented his case-in-chief, Scott Keehner testified that he was employed by Bulk as an operations manager. He managed the terminal box for Bulk Services, which entailed barge logistics, rail logistics, customer service, and accounts receivable. Bulk received cargo by truck and rail. It handled grain, grain byproducts, and fertilizer. The cargo was moved onto the

river through high-speed conveyors. The defendant Fleeting employees did not have any role in loading the barges. Bulk was in charge of loading and cleaning the barges. In cleaning the barges, Bulk employees never used a backpack leaf blower because of the danger of chest strapping over a life jacket, so they only purchased handheld leaf blowers for their employees.

¶ 36    Keehner testified that his employer regularly created and maintained business records pertaining to barge loading operations. He identified exhibit 41 as a barge report and the second page as a barge inspection report. Exhibit 25 consisted of a barge report dated March 17, 2018. The barge record concerned "Big 654," which was being loaded in the White Dock. According to the document, Big 654 was loaded with corn gluten feed (GPF). He was familiar with GPF and testified that it does not smell like manure and was brown in color, not yellow. According to the barge report, the first railcar started unloading brown corn gluten feed into the hopper to be conveyed to Big 654 at 7 p.m., and the last railcar finished unloading at 8:40 p.m. The second page was a barge inspection report, which meant that the barge had been inspected prior to and after loading. At 10:15 p.m., Big 654 was fully cleaned and ready to be picked up by the defendant Fleeting.

¶ 37    On cross-examination, Keehner testified that GPF was brown in color, that there were no forms of GPF that were bright yellow in color, and that he was not aware of anywhere in the world where the corn gluten feed was yellow. After a sidebar and a short recess, Keehner took the stand again, and the following occurred:

> "Q. Mr. Keehner, did you speak with anyone prior to your testimony today that would have told you that the testimony thus far in this case has been that the product that was covered all over [the plaintiff] was a bright yellow?
>
> A. Through the lawyers.

16

Q. The lawyers?

A. Um-hum.

Q. Told you what prior testimony was already today?

A. Yes."

At this point, the trial court dismissed the jury, and the following was held outside the jury's presence. The court asked Keehner when he spoke with the attorneys. He responded that they spoke almost every day. The court clarified with the witness, "So are you indicating to me that you were told what the color of the substance of the prior testimony was in this case?" Keehner responded that he was told "that an orange substance or color, yes." The court asked when this occurred, and Keehner responded, "Within the last prior days. But I think it had been brought to my attention prior to that, I don't know, I can't remember that part, but that last few days for sure, yes."

¶ 38 The plaintiff moved to strike the pleadings based on Keehner's testimony. The trial court dismissed the witness from the stand and then addressed the defendants. The court iterated to the defendants that they "excluded the witnesses, and now we have testimony from a key witness that directly contradicts another witness, and I mean, I have to walk a very fine line here on attorney-client privilege." The court also pointed out that this issue was key to the case.

¶ 39 The trial court dismissed the jury for the day, and Keehner retook the stand outside the jury's presence. The court clarified with the witness that he was an employee of Bulk and that the attorneys for the defendant Fleeting, who were parties in this matter, were also the attorneys for his and his company's case brought by the plaintiff for workers' compensation against Terminals, who was not a party in this case. Keehner worked for Terminals, and Terminals was not a party to this case; therefore the court determined that he was an independent witness that should have been

excluded. The last time Keehner had talked with counsel was that morning. The court asked what they spoke about; counsel objected that the communication was protected by attorney-client privilege and that the court should question the witness outside the presence of opposing counsel. The court responded that it was only asking questions not related to the February 1 incident. The court told Keehner, "So any of your answers I only want to know if he talked to you anything about this incident today."

¶ 40    The trial court asked Keehner what he spoke about with counsel earlier that same day. Keehner stated that he took the conversation as a briefing, prepping him for his testimony that day. The court asked if counsel had given him any prior indication about any prior testimony that was given in the case, and Keehner responded, "Yes." When the court inquired as to their discussion, Keehner answered:

> "He just, you know, had told me that [*sic*] to answer everything to my ability of what I was going to be briefed on, and then that in the testimony that they had brought up a color of orange had been effected, you know, through the testimony, which, you know, I told them that we didn't handle anything that was being pertained that was going to be discussed that was orange."

The court again clarified, "so you're telling me today that you spoke with [defense counsel], and he did indicate there was prior testimony in this trial, this trial, was that there was testimony regarding the color of the grain that plaintiff was exposed to?" Keehner answered, "Yes."

¶ 41    Keehner was then excused, and the trial court made the following finding on the record:

> "Counsel, there was a specific order that was made by the defendants in this matter invoking the sequestration of witnesses. There is a very specific reason why parties invoke sequestration of witnesses, and there is a very particular reason why that rule is in effect.

18

This is to ensure there is no collaboration of testimony to ensure to preserve the nature of the testimony of the witnesses in this case. Based on the testimony of this individual, who is an independent witness, while I do understand that you're indicating he was represented in the February 1st matter, the case law in Illinois is clear he is not your client in the facts and the issues that occur in this case at hand. There was a breach of the sequestration order that defendants requested, it was your own motion for your invocation of that, and so I am extremely frustrated, and I am—this is a key—it's not even a collateral matter, this is a very key issue for the jurors to consider as far as not only the credibility of the witness, but as far as the actual exposure of the plaintiff. So I'm going to allow you to respond, but [the plaintiff's counsel] has invoked, and I'm assuming under [Rule] 219(c) requesting a strike of pleadings for this violation, and this is a very severe violation, and I'm very concerned about all of the time and all of the effort that has been spent on ensuring, and I was going to great latitude for your arguments ensuring that these two parties are completely separate, completely separate, and by counsel's own, you know, infraction, you're trying to indicate that, no, it's all one, but the biggest problem is if this was an independent witness in any other matter, not even related to Bulk Service, this is just completely unacceptable. So I guess I'm kind of wanting to hear from your side on why I should not strike the pleadings."

¶ 42 Counsel for the defendants argued that Bulk Services and Fleeting were its client in the other matter regarding the February 1 incident and that the communication was communication with a client. The trial court disagreed, and after reviewing the case law in the matter and after reviewing all of the testimony, especially Keehner's, it granted the plaintiff's motion to strike the pleadings.

19

¶ 43　　The following day, following closing argument, the case was given to the jury, and the sole issue before the jury was that of damages. The jury returned a verdict in favor of the plaintiff awarding him $3.31 million in damages: (1) $60,000 in lost earnings; (2) $500,000 for loss of a normal life; and (3) $2.75 million for past and future suffering. The defendant appeals.

¶ 44　　　　　　　　　　　　　　　II. ANALYSIS

¶ 45　　The defendant raises three main issues on appeal: first that the trial court committed reversible error by imposing the sanction of striking the pleadings, second that the court committed multiple evidentiary errors that cumulatively deprived the defendants of a fair trial, and third that the jury's award of noneconomic damages was excessive and unsupported by the evidence.

¶ 46　　　　　　　　　　　　　　　A. Sanctions

¶ 47　　First, we address whether it was error for the trial court to sanction the defendant and whether any such sanction was appropriate. At the outset, the defendant argues that there was no order invoking Illinois Rule of Evidence 615 (eff. Jan. 1, 2011) in effect during the trial and that, therefore, it could not have violated Rule 615.

¶ 48　　We review whether a trial court erred in issuing sanctions for an abuse of discretion. *Smith v. City of Chicago*, 299 Ill. App. 3d 1048, 1052 (1998). "In determining the propriety of any particular sanction, a reviewing court must look to the same factors upon which the trial court is to rely in fashioning an appropriate sanction under the unique factual circumstances of any given case." *Id.* The appropriateness of a sanction is circumstance specific. *Id.* The review of an order for sanctions "must necessarily focus upon the particular behavior of the offending party that gave rise to the sanction and the effects that behavior had upon the adverse party." *Id.* A reviewing court cannot affirm the imposition of a sanction for any behavior other than that relied upon by the trial court. *Id.*

20

¶ 49     It is well-settled law that, though there is no statute or supreme court rule that mandates that witnesses be excluded from the courtroom during a trial, the trial court possesses the discretion to do so. *Id.* at 1053. "Excluding witnesses is an appropriate device to preclude a witness from shaping his testimony to conform to the testimony of those who already have testified." *In re H.S.H.*, 322 Ill. App. 3d 892, 896 (2001).

¶ 50     Rule 615 of the Illinois Rules of Evidence states that

>        "[a]t the request of a party the court shall order witnesses excluded so that they cannot hear the testimony of other witnesses, and it may make the order of its own motion. This rule does not authorize exclusion of (1) a party who is a natural person, or (2) an officer or employee of a party which is not a natural person designated as its representative by its attorney, or (3) a person whose presence is shown by a party to be essential to the presentation of the party's cause, or (4) a person authorized by law to be present." Ill. R. Evid. 615 (eff. Jan. 1, 2011).

¶ 51     Here, the defendant moved for Rule 615 to be invoked. The trial court found that the defendant violated Rule 615 by holding daily "briefings" with one of the witnesses where it relayed the testimony of adverse witnesses. The trial court then sanctioned the defendant under Illinois Supreme Court Rule 219 (eff. July 1, 2002) for violating Rule 615. Rule 219(c) states as follows: "If a party, or any person *** unreasonably fails to comply with any provision *** or fails to comply with any order entered under these rules, the court, on motion, may enter *** such orders as are just[.]" Ill. S. Ct. R. 219(c) (eff. July 1, 2002). As its sanction, the court dismissed all of the defendant's pleadings and entered a directed verdict in favor of the plaintiff finding the defendant negligent.

¶ 52    In arguing that no order invoking Rule 615 was entered, the defendant relies on *Smith*, 299 Ill. App. 3d 1048, and *In re H.S.H.*, 322 Ill. App. 3d 892. In *Smith*, the parties did not request, nor did the trial court order, that witnesses be excluded from the courtroom. Out of the plaintiff's first five witnesses that testified, the trial court only instructed the first, second, and fifth witnesses not to discuss their testimony with anyone. Next, during the plaintiff's expert testimony, it became clear to the court that the expert witness knew about the testimony of the third and fifth witnesses. When the court realized that the plaintiff's attorney had informed the expert of the substance of those witnesses' testimony, it directed a verdict for the defendants. *Smith*, 299 Ill. App. 3d at 1050-51. The First District, in reversing the trial court, found that a directed verdict, as a sanction for the behavior of counsel that violated no clear or concise court order, constituted an abuse of discretion.

¶ 53    In *In re H.S.H.*, the trial court barred two witnesses from testifying where they spoke with the victim after the victim had testified. On appeal, the Second District found that the sanction was an abuse of discretion and was unduly harsh. The court found that, because the scope of the court's order was unclear, any sanction entered as a perceived violation constituted an abuse of discretion. *In re H.S.H.*, 322 Ill. App. 3d at 898.

¶ 54    In both cases relied on by the defendant, the trial court's order was unclear or absent. Therefore, a directed verdict as a sanction was overly harsh. That is not the case here, where the defendant violated its own motion and where the motion was clear and concise. The court merely granted a motion made by the defendant. The court's order was not unclear. The defendant moved on the record to invoke Rule 615, and the court granted their motion. It is illogical for the defendant to now argue that the scope of its motion was unclear or ambiguous. When the defendant subsequently violated its own motion, the court responded with sanctions in the form of a directed

verdict. Based on the facts and our review of the record, we cannot say that the trial court's sanction of striking the defendant's pleadings was an abuse of discretion, as the defendant violated its own motion.

¶ 55    As to whether the plaintiff was unduly surprised or prejudiced by the defendant's communication with Keehner, we note that the defendant has cited no authority addressing these arguments. Therefore, this is not an issue before this court, and any lack of surprise or prejudice is not grounds for reversal.

¶ 56    Lastly, the trial court did not violate attorney-client privilege where it questioned Keehner on the stand, outside the presence of the jury, and in the presence of the plaintiff and his counsel about the morning discussion he had with defense counsel.

¶ 57                                B. Evidentiary Errors

¶ 58    We review evidentiary errors for an abuse of discretion. *People v. Harris*, 231 Ill. 2d 582, 588 (2008). "A decision is an abuse of discretion only if it is illogical, arbitrary, or contrary to law." *People v. Appelt*, 2013 IL App (4th) 120394, ¶ 86.

¶ 59                        1. *Prejudicial Remarks Made to the Jury*

¶ 60    The plaintiff's counsel remarked on the fact that this was the plaintiff's only opportunity to be compensated and made whole again. The defendant argues that its counsel was denied the opportunity to set the record straight and enter evidence of the plaintiff's workers' compensation claim where the trial court ordered any such references to be excluded.

¶ 61    The remarks made by the plaintiff regarding the plaintiff's opportunity to be made whole again were in reference to the case at hand. Counsel was demonstrating the "one bite at the apple" theory. We cannot say that, based on the cumulative effect of the plaintiff's remarks, the trial

23

court's decision to exclude reference to the workers' compensation claim was an abuse of discretion.

¶ 62                    2. *Evidence of Most Recent Hospitalization*

¶ 63    The defendant argues that the trial court erroneously failed to grant a mistrial after the video deposition testimony of Bocian was entered into evidence and the last question and partial answer of that testimony referenced the plaintiff's hospitalization that occurred two weeks before the trial, as the parties had stipulated to a motion *in limine* barring any evidence regarding that hospital stay.

¶ 64    In denying the defendant's motion for a mistrial, the trial court noted that the answer given by Bocian referenced two weeks but did not give specific dates. The court found that, so long as no more attention was drawn to the last question and answer, any violation of its order *in limine* did not warrant a mistrial. We cannot say that this decision was an abuse of discretion where the jury had no indication of when the video deposition was taken or that the plaintiff's most recent hospitalization had occurred two weeks prior to trial.

¶ 65                              3. *Hearsay*

¶ 66    The defendant argues that the trial court allowed improper hearsay evidence when it allowed the video deposition testimony of Bocian. The defendant claims that much of Bocian's testimony was relaying statements made by the plaintiff to him and that the cumulative effect of this hearsay evidence denied the defendant a fair trial.

¶ 67    We disagree with the defendant's characterization of Bocian's testimony as hearsay. Bocian was a longtime friend of the plaintiff, and his testimony was based on his knowledge and observations of changes in the plaintiff's physical and psychological health.

¶ 68                                4. *Exhibit 90*

¶ 69    Exhibit 90 was a record log of the plaintiff's shifts. It was entered into evidence over the defendant's objection for lack of foundation. The plaintiff then referenced the exhibit in his closing statement where he implied that the defendant had knowledge of the incident where the log stated that the plaintiff was "short of breath." We disagree with both aspects of the defendant's arguments. The record demonstrates that sufficient foundation was laid for the exhibit, and the only objection made by counsel during the plaintiff's closing argument was that he misread the date, which the plaintiff's counsel promptly corrected. We cannot say that the trial court's decision to admit exhibit 90 was an abuse of discretion where a proper foundation was laid. Further, the plaintiff's reference to the exhibit in closing argument did not deny the defendant a fair trial.

¶ 70                        C. Noneconomic Damages Award

¶ 71    Lastly, the defendant argues that the jury's award of noneconomic damages is excessive and unsupported by the evidence. The defendant alternatively argues that the trial court abused its discretion in denying the defendants' motion for remittitur.

¶ 72                        1. *Reasonableness of the Amount Awarded*

¶ 73    A jury's award of damages is excessive where it falls outside the range of fair and reasonable compensation or results from passion or prejudice, or if it is so large that it shocks the judicial conscience. *Richardson v. Chapman*, 175 Ill. 2d 98, 113 (1997). Reviewing courts consider the *Tierney* factors in assessing whether an award is excessive. See *Tierney v. Community Memorial General Hospital*, 268 Ill. App. 3d 1050, 1064 (1994). The factors include (1) permanency and extent of the injuries suffered, (2) plaintiff's age, (3) possibility of future deterioration, (4) medical expenses incurred, (5) past and future lost wages, (6) any restrictions

25

that the injury may have placed on plaintiff's daily activities, and (7) the ratio of special (economic) damages to the overall award. *Id.*

¶ 74    Here, we cannot say that the jury's award is unfair or unreasonable or that it shocks the judicial conscience. The plaintiff's young age at the time of the incident, the permanency of his injuries to his lungs and the lasting effects on his breathing, the permanent restrictions on his daily activities like loading groceries or walking his dog, and the potential necessity for future treatments all weigh in favor of the jury's award for damages. Therefore, we will not upset the jury's decision.

¶ 75                                 2. *Remittitur*

¶ 76    A trial court's denial of a motion for remittitur is reviewed for an abuse of discretion. See *Shatkus v. Checker Taxi Co.*, 111 Ill. App. 2d 1, 8 (1969). As discussed above, we find that the jury's award was not excessive. We likewise find that the trial court did not abuse its discretion in denying the defendant's motion for remittitur where the plaintiff was young, had permanent damage that affected his lungs, and would likely need continued treatment in the future.

¶ 77                              III. CONCLUSION

¶ 78    Based on the foregoing, we affirm the judgment of the trial court striking the defendant's pleadings and entering judgment in favor of the plaintiff. We also affirm the jury's award of damages where it was neither excessive nor unconscionable.

¶ 79    Affirmed.

*Mogensen v. SCF Lewis & Clark Fleeting LLC*, 2025 IL App (5th) 230501

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Madison County, No. 18-L-985; the Hon. Sarah D. Smith, Judge, presiding. |
| **Attorneys for Appellant:** | Douglas E. Gossow and Giles B. Howard, of Goldstein and Price, L.C., of St. Louis, Missouri, for appellant. |
| **Attorneys for Appellee:** | Joseph E. Hoefert, of Joseph E. Hoefert, Attorney at Law, P.C., of Godfrey, and Benjamin P. Tobin, of Pratt & Tobin, P.C., of East Alton, for appellee. |